UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

EQUAL EMPLOYMENT                         )
OPPORTUNITY COMMISSION,                  )
                                         )
                Plaintiff,               )
                                         )
and                                      )
                                         )
LINDA K. ATKINS,                         )      No.:   3:14-CV-441-TAV-HBG
                                         )
                Intervening Plaintiff,   )
                                         )
v.                                       )
                                         )
DOLGENCORP, LLC,                         )
                                         )
                Defendant.               )

**MEMORANDUM OPINION AND ORDER**

This civil action is before the Court on the following motions: (1) defendant's

Motion to Amend Judgment and Motion for Judgment as a Matter of Law or, Alternatively,

for New Trial [Doc. 159]; (2) plaintiff Equal Employment Opportunity Commission's (the

"EEOC") Motion for Permanent Injunction [Doc. 161]; and (3) defendant's Motion to

Disregard Issues Raised for the First Time in EEOC's Reply, or in the Alternative, for

Leave to File a Sur-Reply [Doc. 200]. The parties filed several responses and replies to

these pending motions [Docs. 179, 182, 188, 193, 194, 199].

Also before the Court is the Report and Recommendation (the "R&R") issued by

the Honorable H. Bruce Guyton, United States Magistrate Judge [Doc. 214]. In the R&R,

Judge Guyton recommends granting in part and denying in part intervening plaintiff Linda

Atkins's Motions for Award of Attorneys' Fees and Costs [Docs. 163, 202, 211]. Defendant filed objections to the R&R [Doc. 217], and Atkins responded to those objections [Doc. 218].

For the reasons discussed herein, the Court will: (1) deny defendant's Motion to Amend Judgment and Motion for Judgment as a Matter of Law or, Alternatively, for New Trial [Doc. 159]; (2) grant in part and deny in part the EEOC's Motion for Permanent Injunction [Doc. 161]; (3) grant defendant's Motion to Disregard Issues Raised for the First Time in EEOC's Reply, or in the Alternative, for Leave to File a Sur-Reply [Doc. 200]; (4) overrule defendant's objections to the R&R [Doc. 217]; (5) accept the R&R in whole [Doc. 214]; and (6) grant in part and deny in part Atkins's Motions for Award of Attorneys' Fees and Costs [Docs. 163, 202, 211].

## I.      Procedural Background[1]

This action arises from defendant's alleged discriminatory actions against Linda Atkins in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA").  The EEOC filed its complaint against defendant on September 23, 2014 [Doc. 1], and Atkins filed her intervenor complaint on December 18, 2014 [Doc. 12].[2]  Plaintiffs' ADA claims based on defendant's failure to accommodate Atkins's disability and discharge of Atkins because of her disability proceeded to a jury trial, which took place

---

[1] The Court has previously recited the facts of this case in detail [Doc. 66].  The Court will thus forego a complete recitation of the facts here, and will instead discuss the relevant facts within the context of its analysis of each motion.

[2] The Court will refer to the EEOC and Atkins collectively as "plaintiffs."

September 12–16, 2016 [Docs. 151–56]. At trial, the jury found in favor of plaintiffs on both claims and awarded Atkins $27,565.44 in back pay and $250,000 in compensatory damages [Doc. 148]. The jury determined, however, that plaintiffs had not met their burden of showing that defendant acted with malice or reckless indifference to Atkins's rights under the ADA and, consequently, the jury declined to award punitive damages against defendant [*Id.*]. Consistent with the jury verdict, the Court entered judgment in this case on September 23, 2016 [Doc. 149].

All parties subsequently filed post-trial motions.[3] The Court will address the following motions in turn: (1) defendant's motion to amend judgment; (2) defendant's motion for judgment as a matter of law; (3) defendant's motion for a new trial; (4) defendant's motion to reduce the jury award; (5) defendant's motion to disregard portions of the EEOC's reply or for leave to file a sur-reply; and (6) the EEOC's motion for injunctive relief. Lastly, the Court will address Judge Guyton's R&R [Doc. 214], which includes a recommended disposition of Atkins's motions for attorney's fees and costs [Docs. 163, 202, 211].

## II.    Motion to Amend Judgment

Defendant moves the Court to alter or amend the judgment in this case pursuant to Federal Rule of Civil Procedure 59(e). Specifically, defendant asks the Court to reconsider its previous analysis of 42 U.S.C. § 2000e-5(e)(1) regarding the applicable administrative

---

[3] Defendant combined its motion to amend judgment, motion for judgment as a matter of law, motion for a new trial, and motion to reduce the jury award into one consolidated document [Doc. 159].

filing deadline, enforce a 180-day deadline, and accordingly amend the judgment to dismiss plaintiffs' claims as untimely.

"A district court may grant a Rule 59(e) motion to alter or amend judgment only if there is: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). Rule 59 motions "are not intended as a vehicle to relitigate previously considered issues . . . and are not the proper vehicle to attempt to obtain a reversal of a judgment by offering the same arguments previously presented." *Kenneth Henes Special Projects Procurement v. Cont'l Biomass Indus., Inc.*, 86 F. Supp. 2d 721, 726 (E.D. Mich. 2000) (emphasis and citation omitted); *see also Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (noting that a Rule 59(e) motion "is not an opportunity to re-argue a case" nor an avenue to raise arguments that "could have, but [were] not" raised before); *Beltowski v. Bradshaw*, No. 1:08-cv-2651, 2009 WL 5205368, at *4 (N.D. Ohio Dec. 23, 2009) ("The motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple.").

"The grant or denial of a Rule 59(e) motion is within the informed discretion of the district court." *Constr. Helicopters, Inc. v. Heli-Dyne Sys., Inc.*, Nos. 88-1166, 88-1192, 1989 WL 54111, at *4 (6th Cir. May 23, 1989) (citations omitted)). The narrow aims of Rule 59(e) focus on empowering district courts to rectify their own mistakes immediately following the entry of judgment. *See United States v. Willyard*, No. 3:07-cr-44, 2008 WL

471683, at *2 (E.D. Tenn. Feb. 19, 2008) (citations omitted). The moving party must "set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *McDaniel v. Am. Gen. Fin. Servs.*, No. 04-2667 B, 2007 WL 2084277, at *2 (W.D. Tenn. July 17, 2007).

Defendant argues the Court should amend the judgment because the Court committed a clear error of law and there is a need to prevent manifest injustice. In particular, defendant asserts that a 180-day administrative filing deadline is applicable to plaintiffs' claims. Defendant has repeated this argument in multiple filings before the Court [Docs. 28, 29, 39, 49, 96, 97, 104, 127, 133], and the Court has rejected it in two separate opinions [Doc. 66 pp. 24–27; Doc. 139 pp. 5–10].

The Court previously interpreted the phrase "unlawful employment practice," set forth in 42 U.S.C. § 2000e-5(e)(1), as encompassing the practice of disability discrimination generally [Doc. 139 pp. 5–10]. Defendant contends that this finding constitutes clear error as, according to defendant, the phrase unlawful employment practice "has consistently and unambiguously referred in federal law—and the EEOC's own guidance—to specific employment practices as discriminatory hiring, promotion, discipline, or failure to accommodate, not 'disability discrimination generally'" [Doc. 172 pp. 5–6].

The Court detailed, in two different opinions, the rationale behind its interpretation of the phrase "unlawful employment practice," and the Court notes that Rule 59 motions "are not intended as a vehicle to relitigate previously considered issues." *Kenneth Henes*

*Special Projects Procurement*, 86 F. Supp. 2d at 726. Entertaining defendant's previously litigated argument would provide defendant not only with an improper "second bite at the apple," but a third. *See Beltowski*, 2009 WL 5205368, at *4. As such, the Court finds that defendant's argument concerning the proper interpretation of § 2000e-5(e)(1) is inappropriate for purposes of a motion for reconsideration. Furthermore, the Court finds that defendant has not "set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *McDaniel*, 2007 WL 2084277, at *2.

Accordingly, the Court will deny defendant's motion for reconsideration for the same reasons set forth in its previous opinions [Doc. 66 pp. 24–27; Doc. 139 pp. 5–10]. The Court incorporates by reference its previous analyses in these opinions on the issue of the timeliness of plaintiffs' claims.

## III.  Motion for Judgment as a Matter of Law

Defendant also moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Rule 50 permits a party to renew a motion for judgment as a matter of law within twenty-eight days of the entry of judgment. Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

To succeed on a motion for judgment as a matter of law, the movant must show that a "reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-moving party. Fed. R. Civ. P. 50(a)(1). In considering this question, the Court may not

weigh the evidence or question the credibility of the witnesses. *Schwartz v. Sun Co. (R&M)*, 276 F.3d 900, 903 (6th Cir. 2002). Ultimately, the Court may not substitute the jury's judgment for its own. *Id.* Rather, the Court "must view the evidence in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor." *Id.* (citation and internal quotation marks omitted).

Defendant asserts that it is entitled to judgment as a matter of law as to plaintiffs' failure to accommodate and discriminatory discharge claims. The Court will first address the failure to accommodate claim and will then turn to the discriminatory discharge claim.

### A. Failure to Reasonably Accommodate Claim

Defendant submits that it is entitled to judgment as a matter of law on plaintiffs' failure to reasonably accommodate claim because: (1) plaintiffs did not present proof that Atkins actually needed an accommodation; and (2) defendant did not have an obligation to engage in the interactive process. The Court will address these arguments in turn.

### 1. Necessary Accommodation

In order to prevail on a reasonable accommodation claim, a plaintiff must show that the employer failed to provide a necessary accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). Defendant asserts that no reasonable juror could have concluded that Atkins actually needed an accommodation because Atkins already had "numerous viable options" available to prevent a hypoglycemic episode, "none of which required a variation from [defendant's] policy" [Doc. 172 p. 11].

Defendant points out that Atkins's primary care provider, Linda Thayer, testified that a diabetic patient experiencing low blood sugar should "ingest glucose in some form, approximately 100 calories" [Doc. 151 p. 104]. Thayer further provided that a patient can fit multiple forms of glucose in her pockets, including: glucose tablets, gels, liquids, candy, and foods with sugar in them, such as a pack of peanut butter crackers [*Id.* at 117–19, 21]. In addition, Thayer explained that, irrespective of a patient's preference, all of those options are equally viable [*Id.* at 119]. She also stated that she regularly discusses such treatment options with her patients [*Id.* at 122].

During the trial, Atkins admitted that: (1) she has carried candy to address low blood sugar in the past; (2) she previously purchased glucose tablets, which she kept in her car; (3) a package of peanut butter crackers would prevent a hypoglycemic episode; and (4) she used honey for low blood sugar episodes [Doc. 151 pp. 156–57, 161, 163; Doc. 154 p. 68]. Atkins stated that "lots of things work," but that she preferred orange juice to other alternatives [Doc. 154 p. 68]. Based on this evidence, defendant asserts that "[n]o reasonable juror could conclude that Atkins did not have viable options available to her to address her low blood sugar, options of which she was aware and which were medically effective" [Doc. 172 p. 12].

The Court finds, however, that even if this evidence established, as a matter of law, that these other options were medically effective, and that Atkins knew they were medically effective, a reasonable juror could have concluded that Atkins did not know that exercising such options would not violate defendant's policies. Defendant's "Personal

8

Appearance" policy states, "Employees should not chew gum or eat/drink, except during breaks (which should not be taken on the sales floor, at registers, etc.)" [Doc. 28-1 p. 101]. Viewing this evidence in the light most favorable to plaintiffs, a reasonable jury could conclude that a policy prohibiting an employee from chewing gum and eating food would also prohibit an employee from consuming items such as glucose tablets, cough drops, candy, and honey packets.

Defendant points out that plaintiffs did not present any proof that defendant has ever prohibited its employees from taking medication. However, plaintiffs presented evidence that Atkins's manager, Wanda Shown, indicated it would be against company policy for Atkins to drink orange juice at the register, even though it was for a medical purpose [Doc. 154 pp. 16–17]. Although Jeri West, defendant's Employee Relations Manager, testified that defendant would not prohibit Atkins from having glucose tablets, cough drops, candy, or honey packets at the register [Doc. 155 pp. 157–58], a reasonable jury could determine that this testimony is contrary to the information Wanda Shown gave Atkins regarding consuming juice at the register. While defendant contends that ingesting glucose tablets, cough drops, candy, or honey packets would not be in violation of the Personal Appearance policy, a reasonable jury could conclude that these items are analogous to food or gum, and that the policy prohibits eating food or chewing gum at the register. The Court also notes that the Personal Appearance policy does not contain an exception for taking medication [*See* Doc. 28-1 p. 101].

Because a reasonable jury could conclude that Atkins did not know whether having glucose tablets, cough drops, candy, or honey packets at the register violated defendant's policies, and because Wanda Shown did not inform her that she was allowed to have these items for a medical purpose, a reasonable jury could conclude that Atkins needed an accommodation. If, as defendant argues, having glucose tablets, cough drops, candy, or honey packets at the register would not violate the Personal Appearance policy, then defendant should have engaged in the interactive process and discussed those options with Atkins after she requested an accommodation. The Court will further address this issue below.

### 2.  The Interactive Process

Defendant argues that it is entitled to judgment as a matter of law because it was not obligated to engage in the interactive process. Once an employee requests an accommodation, "the employer has a duty to engage in an 'interactive process' to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Melange v. City of Center Line*, 482 F. App'x 81, 84 (6th Cir. 2012) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)). This "interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871.

"Employers who fail to engage in this interactive process in good faith face liability under the ADA if reasonable accommodations would have been possible." *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 813 (M.D. Tenn. 2011) (quoting *Lafata v. Church of*

*Christ Home for the Aged*, 325 F. App'x 416, 422 (6th Cir. 2009)). A claim for a failure to engage in an interactive process requires that the employee demonstrate that she "could have been reasonably accommodated but for the employer's lack of good faith." *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005). However, where the reasonable accommodation is obvious, it may not be necessary for the parties to engage in the interactive process. *See* 29 C.F.R. § 1630.9, App. ("In many instances, the appropriate reasonable accommodation may be so obvious to either or both the employer and the individual with a disability that it may not be necessary to proceed in this step-by-step fashion.").

Here, defendant does not dispute that Atkins requested an accommodation and that defendant did not engage in the interactive process. Rather, defendant argues that it did not need to engage in the interactive process because doing so would have turned defendant into a *de facto* healthcare provider and because the other options available to Atkins were obvious.

As to defendant's first point, it argues that engaging in the interactive process would require it to opine on whether ingesting glucose tablets, cough drops, candy, or honey packets are equally effective at preventing hypoglycemic attacks as drinking orange juice. The Court finds, however, that defendant misconstrues the purpose of the interactive process in this case. The purpose of the interactive process here would be for Atkins to suggest medically effective solutions and for defendant to inform Atkins either that those

solutions did not violate defendant's policies, or that defendant could provide exceptions to such policies as a reasonable accommodation.

After Atkins asked Shown if she could carry orange juice at the register, instead of telling her to be careful of the cameras, Shown could have asked Atkins whether there was something smaller she could carry that would prevent a hypoglycemic episode. At which point, Atkins could have either suggested items like glucose tablets, cough drops, candy, or honey packets, or she could have consulted with her medical provider. Shown also could have referred Atkins to Jeri West, who could have then informed Atkins that carrying and eating glucose tablets, cough drops, candy, or honey packets at the register would not violate defendant's policies. Had Shown referred Atkins to another manager, the jury heard evidence that another manager would have provided plaintiff with her requested accommodation. Matthew Irwin, defendant's Regional Loss Prevention Manager, testified that defendant would have allowed Atkins to keep juice at the register for medical reasons and that doing so would not have been an undue hardship on defendant [Doc. 153 p. 114].

Because defendant failed to engage in this process, however, a reasonable jury could conclude that defendant failed in its obligation to "make a reasonable effort to determine the appropriate accommodation." *Gantt v. Wilson Sporting Goods, Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998). Consequently, the Court finds that defendant's argument that engaging in the interactive process would turn defendant into a *de facto* healthcare provider is without merit.

Defendant also argues that it had no obligation to engage in the interactive process because Atkins's other options were obvious. As the Court has already discussed, however, a reasonable jury could determine that eating glucose tablets, cough drops, candy, or honey packets at the register, even if the employee did so for a medical purpose, would not comply with defendant's Personal Appearance policy. As such, the Court finds that a reasonably jury could conclude that Atkins did not have any obvious viable options available to her.

Based on the evidence presented at trial, a reasonable jury could have concluded that defendant had an obligation to participate in the interactive process, and failed to do so. In sum, upon review of the evidence, the Court finds that defendant is not entitled to judgment as a matter of law as to plaintiffs' failure to accommodate claim because the evidence at trial presented a legally sufficient evidentiary basis for the jury to find defendant liable as to that claim.

**B.     Discriminatory Discharge Claim**

Defendant contends that it is entitled to judgment as a matter of law as to plaintiffs' discriminatory discharge claim because: (1) no reasonable juror could have concluded Atkins was replaced, the job remained open, or similarly situated non-protected employees were treated more favorably; and (2) there is no cause of action for termination flowing from a failure to accommodate. The Court will address these arguments in turn.

**1.** **Whether Atkins Was Replaced, the Job Remained Open, or Similarly Situated Non-Protected Employees Were Treated More Favorably**

For plaintiffs to prevail on their claim for discriminatory discharge, plaintiffs must have submitted proof that Atkins was replaced, the job remained open, or similarly situated non-protected employees were treated more favorably. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). Defendant contends that plaintiffs did not make this showing because defendant presented evidence at trial that two non-disabled workers, Mark Beaver and Sandra Viefeld, were terminated on the same day as Atkins, by the same supervisors, and for the same reason Atkins was terminated.

A plaintiff cannot show dissimilar treatment if the evidence establishes that she "was treated the same as a similarly situated individual outside [the] protected class[]." *See Key v. Cincinnati Hamilton Cty. Cmty. Action Agency*, No. 1:09-CV-139, 2011 WL 4548922, at *10 (S.D. Ohio 2011) (applying this principle to race and age discrimination). In determining whether employees are similarly situated, it is necessary to consider "whether the individuals have dealt with the same supervisor, have been subject to the same standard[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2007) (citations and internal quotation marks omitted).

In the Court's previous Memorandum Opinion and Order denying summary judgment, the Court determined that Viefeld and Beaver were not similarly situated to

Atkins because they, unlike Atkins, did not violate the anti-grazing policy due to a medical emergency [Doc. 66 p. 45]. The Court found that this distinction constituted a differentiating or mitigating circumstance and, therefore, that Viefeld and Beaver's termination could not negate plaintiffs' showing of dissimilar treatment [*Id.*].

During trial, the Court instructed the jury that in considering whether defendant treated other employees the same as Atkins, it should consider whether the employees were "the same in all relevant aspects," and gave examples of factors to consider in making the determination of whether the employees were "similarly situated" [Doc. 156 pp. 192–93]. Upon review of the evidence, a reasonable jury could conclude, as the Court previously did, that Viefeld and Beaver were not similarly situated to Atkins, and thus, were not comparable under the circumstances.

Although a reasonable jury could have determined that Viefeld and Beaver were not comparable under the circumstances, plaintiffs still must have otherwise shown that Atkins was replaced, the job remained open, or similarly situated non-protected employees were treated more favorably than Atkins. Atkins argues that it would have been reasonable for the jury to conclude that defendant treated similarly situated, non-protected employees more favorably when it did not discipline, let alone discharge, Wanda Shown or Tracy Choate for allowing grazing in their store.

Employees do not have to engage in identical conduct to be "similarly situated." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778 n.4 (6th Cir. 2016). Rather, in determining whether employees are similarly situated, the focus should be "on

the severity of the differently treated employees' actions," including "the actual and potential consequences of the employee's actions." *Id.* at 780.

Here, the jury heard evidence that Choate saw Atkins buy Little Debbie cakes that she had already consumed [Doc. 154 pp. 250–51]. The jury also heard evidence that Matt Irwin was aware that Choate had witnessed employees grazing [Doc. 155 p. 92]. Despite defendant's policy that store managers can be disciplined for allowing employees to violate the grazing policy, Choate was not disciplined for her actions [*Id.*; Doc. 154 p. 253]. In addition, the jury heard evidence that Matt Irwin and Scott Strange were aware that Shown had previously excused Atkins's grazing [Doc. 154 pp. 170–71]. However, Irwin and Strange did not discuss this violation with Shown and did not discipline her for excusing Atkins's grazing. [Doc. 153 p. 112; Doc. 154 pp. 170–71].

As defendant considered grazing a terminable offense, a reasonable jury could conclude that defendant's decision not to terminate, or even discipline, Choate and Shown for excusing grazing resulted in defendant treating similarly situated non-protected employees more favorably than Atkins. Consequently, it was reasonable for the jury to conclude that defendant treated similarly situated, non-protected employees more favorably than Atkins.

> ## 2. Discriminatory Discharge Resulting From a Failure to Accommodate

Defendant asserts that it is entitled to judgment as a matter of law on plaintiffs' discriminatory discharge claim because there is no separate cause of action for a

termination resulting from a failure to accommodate. Defendant contends that Atkins's termination would, at most, represent a measure of her damages, not a stand-alone claim.

One case defendant cites to support this position is *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906 (10th Cir. 2004). In that case, a jury returned a verdict in favor of the employee on the failure to accommodate claim and in favor of the employer on the wrongful termination claim. *Id.* at 910, 911 n.1 (indicating that the jury received a verdict form with two separate claims). The court in *Bartee* found that because the elements of the two claims differ, "they appear to present separate and distinct causes of action," and, consequently, that the jury verdict was consistent despite its finding that the employer was liable for the failure to accommodate claim and that the employer was not liable for the discriminatory discharge. *Id.* at 911. Although the employee asserted that the failure to accommodate led to his discharge, the jury disagreed. *Bartee v. Michelin N. Am., Inc.*, 160 F. App'x 810, 812–13 (10th Cir. 2006) ("*Bartee II*").

Here, as in *Bartee*, the jury could have determined that plaintiffs satisfied the elements of their failure to accommodate claim, but that the discharge was not discriminatory. For example, the jury could have credited the testimony that the termination resulted from plaintiff's violation of the anti-grazing policy by eating Little Debbie cakes. Consequently, the Court finds that *Bartee* and *Bartee II* support the proposition that a plaintiff can allege separate causes of action for a failure to accommodate and a discriminatory discharge based on that failure to accommodate. *See, e.g.*, *Gandall v. Flightsafety Int'l, Inc.*, No. 12-CV-82, 2012 WL 3000257, at *1 (N.D. Okla. July 23, 2012)

(citing *Bartee* for the proposition that a plaintiff can plead failure to accommodate and discriminatory discharge as separate claims).

Accordingly, the Court finds that a reasonable jury could find that plaintiffs proved their discriminatory discharge claim based on a failure to accommodate. As the Court has determined that all of defendant's arguments in favor of its motion for judgment as a matter of law are without merit, the Court will deny that motion.

## IV. Motion for a New Trial

Defendant also moves for a new trial under Federal Rule of Civil Procedure 59(a). A new trial is warranted under Rule 59(a) "when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillion*, 78 F.3d 1041, 1045–46 (6th Cir. 1996). In addition, a party may move for a new trial based on a trial court's erroneous admission of evidence or improper jury instructions amounting to "more than harmless error." *Kendel v. Local 17-A UFCW*, 512 F. App'x 472, 479 (6th Cir. 2013). Harmless error results when the Court has "fair assurance" that the outcome of the trial was not affected by the error. *Id.*

Defendant argues that it is entitled to a new trial because: (1) the verdict was against the weight of the evidence; (2) the Court provided improper jury instructions; (3) the Court erroneously excluded evidence; and (4) the damages were excessive. The Court will address each of these arguments in turn.

## A.    Weight of the Evidence

In deciding a Rule 59(a) motion based on the weight of the evidence, the Court "must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence." *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998).  The Court may grant a motion for a new trial based on the weight of the evidence upon on a lower showing than that required for granting a motion for judgment as a matter of law.  *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007).  However, the Court "should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable."  *Strickland*, 142 F.3d at 357.

In support of its argument for a new trial based on the verdict being against the weight of the evidence, defendant refers to its arguments in favor of its motion for judgment as a matter of law.  Specifically, defendant argues that the verdict was clearly against the weight of the evidence because Atkins had viable and obvious options to address any low blood sugar episode, and these options would not have required defendant to excuse her from its policies.  In addition, defendant asserts that because Atkins was treated the same as non-disabled comparable employees, plaintiffs did not establish that defendant treated similarly situated, non-protected employees more favorably.

The Court incorporates its previous discussion of these issues and finds that even in light of the lower standard applicable to a motion for a new trial, and after weighing the

evidence, the jury verdict was reasonable based on the evidence the parties presented at trial. In particular, the Court notes that the Personal Appearance policy does not contain an exception for taking medication [*see* Doc. 28-1 p. 101], and because defendant did not engage in the interactive process, the Court finds that the weight of the evidence supports finding that Atkins did not know about the other allegedly viable options. The Court has also detailed the differentiating circumstances between Atkins and those of Viefeld and Beaver, and the Court finds that such circumstances justify the jury's determination that Atkins was not similarly situated to Viefeld and Beaver. Accordingly, the Court finds that the weight of the evidence does not support finding that defendant is entitled to new trial in this matter.

### B.    Improper Jury Instructions

Defendant also asserts that it is entitled to a new trial based on the Court's allegedly improper jury instructions. Jury instructions are proper if, as a whole, they "fairly and adequately submitted the issues and applicable law to the jury." *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). A post-trial "inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to reach a conclusion." *Pivnick v. White, Getgey & Meyer Co.*, 552 F.3d 479, 488 (6th Cir. 2009). Erroneous jury instructions do not warrant granting the defendant a new trial if the instructions constitute harmless error. *Kendel*, 512 F. App'x at 479.

When a court refuses to give a proposed jury instruction, that refusal warrants reversal if: "(1) the omitted instruction is a correct statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 396 (6th Cir. 2014).

Defendant contends that the Court erroneously instructed the jury by: (1) charging the jury with a termination for disability related conduct claim; (2) failing to provide a business judgment rule instruction; and (3) failing to provide an honest belief instruction. The Court will address these arguments in turn.

### 1.    Termination for Disability Related Conduct

Defendant asserts that the Court erroneously instructed the jury that it could find ADA liability on a discriminatory discharge claim if it concluded that defendant terminated Atkins for disability related misconduct, without proof of anti-disability animus or pretext.

In its charge to the jury, the Court used the *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework as the basis for its instructions on plaintiffs' discriminatory discharge claim [Doc. 156 pp. 192–94]. As such, the Court instructed the jury that if plaintiffs prove each element of their *prima facie* case, the burden then shifts to defendant to "proffer a legitimate nondiscriminatory reason for the adverse employment action" [*Id.* at 192]. The Court further stated the following:

> Defendant has argued that it terminated M[s.] Atkins for a legitimate nondiscriminatory reason; that is, violating its employee purchase policy. Under the ADA, if an employee committed a conduct or rule violation because of her disability, an employer may only discipline the employee if

21

the rule she violated is job-related and enforcing that rule . . . is consistent with business necessity.

Whether enforcing a conduct rule is job-related and consistent with business necessity may rest on several factors, including the manifestation or symptom of a disability affecting an employee's conduct, the frequency of occurrences, the nature of the job, the specific conduct at issue, and the working environment.

If you find defendant terminated M[s.] Atkins for conduct that was caused by her disability and that defendant's enforcement of the conduct rule against M[s.] Atkins was not job-related and consistent with the business necessity, that reason is not a legitimate nondiscriminatory reason for termination, and you must find for plaintiffs on the discriminatory discharge claim [*Id.* at 193–94].

Defendant argues that this instruction is contrary to the law governing ADA claims, which requires an improper state of mind in order to find liability for discriminatory discharge under the ADA.

Although defendant contends that "the ultimate question in analyzing disparate treatment claims . . . is whether a challenged employment action was motivated by animus against a protected characteristic" [Doc. 172 p. 20], the Sixth Circuit has provided that the ultimate question is whether discrimination is a "but-for" cause of the employer's adverse action. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc). While the typical disparate treatment claim involves evidence of discriminatory intent, such proof is not determinative in all cases.

For example, in *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729 (6th Cir. 2015), the Sixth Circuit analyzed whether the enforcement of a conduct rule was "job-related and consistent with business necessity" in determining whether an employer had

"legitimate, nondiscriminatory reasons" for terminating an employee. *Id.* at 739–40. In that case, the Sixth Circuit considered whether a bi-polar employee's violation of company policies concerning safety and security, as well as general behavior standards, during a manic episode, constituted legitimate, nondiscriminatory reasons for his termination. *Id.* The court looked at the manifestation or symptom of a disability affecting the employee's conduct, the frequency of occurrences, the nature of the job, the specific conduct at issue, and the working environment, and the court ultimately determined that the employer had terminated the bi-polar employee for legitimate, nondiscriminatory reasons. *Id.* Only after making this finding did the court turn to the pretext analysis. *Id.* at 739–41. Had the Sixth Circuit found in *Yarberry* that the bi-polar employee's violation of the policies did not constitute legitimate, nondiscriminatory reasons for termination, the employer would have been subject to ADA liability without a finding of animus or pretext.

The Court also finds the case *Hildebrand v. Dollar General Corp.*, No. 3:11-cv-554, 2013 WL 3761291 (M.D. Tenn. July 16, 2013), instructive. In *Hildebrand*, the court considered whether summary judgment was appropriate on a discriminatory discharge claim where the plaintiff alleged that her termination resulted from the defendant's failure to accommodate her disability. *Id.* at *6–8. The court found that the case hinged on whether the defendant's failure to accommodate the plaintiff's disability "was the 'but for' cause of the performance deficiencies for which she was terminated." *Id.* at *6. In doing so, the court did not mention discriminatory animus.

Defendant points out that the court in *Hildebrand* referred to the defendant's potential animus by stating that the plaintiff's "supervisors rebuffed [the plaintiff's] requests for an accommodation and even demeaned her for asking for one." *Id.* at *7. However, the court only mentioned those actions to explain why it was "not obvious what actually would have happened if [the defendant] had engaged in the requisite interactive process." *Id.* The court did not posit that the supervisors' actions were evidence of discriminatory animus that would preclude summary judgment. Instead, the court denied summary judgment because there was a question of fact as to whether the plaintiff "would or would not have performed the essential functions of her job with an accommodation." *Id.* at *7–8.

Upon review of the parties' arguments and the relevant law, the Court has determined that a defendant does not need to act with an improper state of mind in order to be liable for discriminatory discharge. As such, the Court's instructions allowing the jury to find defendant liable for discriminatory discharge without finding that defendant acted with discriminatory animus is not erroneous and does not provide a basis for granting defendant's motion for a new trial.

### 2. Business-Judgment Rule Instruction

Defendant also contends that the Court committed error in omitting an instruction on the business-judgment rule in the jury charge. The Sixth Circuit has provided, however, that it "has never adopted a 'business-judgment rule' which requires [it] to defer to the employer's 'reasonable business judgment'" in discrimination cases. *See White v. Baxter*

*Healthcare Corp.*, 533 F.3d 381, 395 n.6 (6th Cir. 2008) (stating in the context of a Title VII claim).  Indeed, the issue in most discrimination cases is "whether the employer's adverse employment action resulted from an objectively unreasonable business judgment." *Id.*  As such, it is inappropriate to "unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of 'reasonable business judgment.'" *Id.* Instead, the jury should determine whether a plaintiff has presented enough evidence "that the employer made an unlawful business decision." *Id.*

As the Sixth Circuit has provided that the business-judgment rule does not apply to discrimination cases, the Court's decision to omit an instruction explaining the rule was not in error and does not provide a basis for a new trial.

### 3.    Honest Belief Instruction

Defendant argues that the Court erred by refusing to give the jury an honest belief instruction.  The honest belief rule "provides that as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016).  Defendant contends that the Court should have given the jury an instruction explaining this rule because defendant had an honest belief at the time of Atkins's termination and subsequent appeal that Atkins had engaged in several violations of the Employee Purchase Policy, including consuming Little Debbie cakes, for which Atkins offered no excuse.

The Court chose not to include an honest belief instruction because such an instruction may have confused the jury given the Court's instruction that the jury should consider whether defendant's decision to enforce a conduct rule was job-related and consistent with business necessity. *See McDole v. City of Saginaw*, 471 F. App'x 464, 477 (6th Cir. 2012) (finding that a district court has discretion to omit an instruction to prevent jury confusion). In addition, the Court finds that the instructions given substantially covered the honest belief rule. When discussing causation, the Court instructed the jury as follows:

> Plaintiffs must prove the defendant would not have terminated M[s.] Atkins but for her disability. Plaintiffs do not have to prove that M[s.] Atkins' disability was the sole reason defendant terminated her. Plaintiffs must prove, however, that defendant terminated Ms. Atkins because of her disability or as a result of defendant's failure to provide a reasonable accommodation to Ms. Atkins [Doc. 156 p. 195].

If the jury believed that Atkins's termination hinged on defendant's honest belief that Atkins had consumed Little Debbie cakes, then Atkins's disability would not have been a but-for cause of her termination. Accordingly, including the honest belief instruction would not have affected the outcome of the case because the jury charge substantially covered the effect of the rule. Similarly, the Court finds that omitting the honest belief instruction did not "impair[] [defendant's] theory of the case" because defendant could have argued that its honest belief underlying Atkins's termination was not discriminatory. *See Decker*, 770 F.3d at 396.

In sum, the Court finds that its instructions to the jury do not warrant granting defendant a new trial.

## C.    Exclusion of Evidence

Defendant argues that the Court erred in excluding Beaver and Viefeld's handwritten statements. District courts have "[b]road discretion" to determine whether evidence is admissible or not, "and those decisions will not be lightly overturned." *Nolan v. Memphis City Schs.*, 589 F.3d 257, 264–65 (6th Cir. 2009). Furthermore, even if an evidentiary ruling is erroneous, a new trial is not warranted if the ruling constitutes harmless error. *Id.*

Defendant argues that the Court's exclusion of Beaver and Viefeld's handwritten statements unfairly prejudiced defendant. In support of this argument, defendant submits that plaintiffs suggested to the jury that Irwin "singled Atkins out" by pressuring her to "include assertions in her handwritten statement to set her up for termination" [Doc. 172 p. 28]. Defendant argues that Beaver and Viefeld's handwritten statements would have rebutted this implied assertion.

Even assuming the Court's exclusion of this evidence was in error, defendant has not shown that the Court's exclusion of these handwritten statements amounts to "more than harmless error." *Kendel*, 512 F. App'x at 479. Irwin testified that Atkins's statement merely reflected what he and Atkins had discussed [Doc. 155 p. 622]. Under defendant's theory, admission of the Beaver and Viefeld statements would have provided additional rebuttal evidence to the same argument that Irwin rebutted with his testimony. There is no indication that exclusion of additional rebuttal evidence in the form of the Beaver and Viefeld statements caused any harm to defendant, as plaintiff's argument in question was

rebutted by live witness testimony. In light of this, even if the statements were erroneously excluded, the Court's exclusion of these statements does not warrant a new trial.

### D.    Excessive Damages

Defendant also argues it is entitled to a new trial because the jury awarded excessive damages. When a jury award is "so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, remitter is inadequate and the only proper remedy is a new trial." *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 684 (5th Cir. 1986) (internal quotation marks and citation omitted). According to defendant, the jury award was unsupported by the evidence and, therefore, it must have been driven by the jury's passion and sympathy. Consequently, defendant argues that remitter is inadequate and the proper remedy for the excessive damages is for the Court to grant a new trial.

Defendant argues that the only evidence of Atkins's emotional distress was her testimony that she had been depressed, helpless, and humiliated following her termination. Defendant further asserts that plaintiffs did not offer any evidence that Atkins suffered any serious or long-lasting injury, pain, suffering, or humiliation because of her discharge.

Upon review of the evidence, however, Atkins testified that: (1) she was out of work for five or six months; (2) her termination forced her to begin working in a new field; (3) that her new job required her to work more hours; (4) she missed the fast-paced environment she liked about working for defendant, which led to feelings of depression; (5) being accused of theft "went to [her] core" and affected her personal pride; (6) being accused of theft caused her anxiety when applying for subsequent employment; and (7) her

termination caused her to have health issues [*See* Doc. 154 pp. 39–54]. In light of this evidence, and as further discussed below, Court finds that the jury's award of $250,000 in compensatory damages was not so excessive as to warrant a new trial.

**V.      Motion to Reduce the Jury Award**

In the alternative to its motion for a new trial based on excessive damages, defendant moves the Court to reduce the jury award. A "district court should reduce a jury's verdict only when the judgment 'clearly exceeds' the maximum amount of compensatory damages a jury could reasonably award." *Stayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000). The Court "may reduce a jury award only if it is (1) beyond the range supportable by proof, (2) so excessive as to shock the conscience, or (3) the result of a mistake." *Id.*

Defendant contends that the Court should reduce the award because it is beyond the range supportable by Atkins's testimony and because the award shocks the conscious. The Court notes that the jury award of $250,000 is below the statutory cap for non-economic damages in employment discrimination cases. 42 U.S.C. § 1981a. In addition, while defendant points out that Atkins's damages were premised on her own testimony, "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to" show that an employer's actions caused the plaintiff emotional distress. *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996). In the previous section, the Court detailed portions of Atkins's testimony describing the extent of her damages, and the Court notes that defendant did not rebut this testimony.

While defendant cites a number of cases ordering or affirming remittiturs of compensatory damages [Doc. 172 pp. 29–30], and several cases where much lower awards for compensatory damages were upheld [*Id.* at 30], the Sixth Circuit has cautioned against courts attempting to reconcile widely varied past awards for analogous injuries. *Fischer v. UPS, Inc.*, 390 F. App'x 465, 472 (6th Cir. 2010) (upholding the district court's denial of the defendant's remittitur motion when the award was $650,000 for emotional distress based solely on the plaintiff's own testimony).

Accordingly, in light of the evidence presented at trial, the Court does not find that the jury award "'clearly exceeds' the maximum amount of compensatory damages a jury could reasonably award." *See Stayton*, 206 F.3d at 679. The Court will, therefore, deny defendant's motion to decrease the jury award.

## VI.  Motion to Disregard Issues Raised for the First Time in the EEOC's Reply, or in the Alternative, for Leave to File a Sur-Reply

Before addressing the merits of the motion for a preliminary injunction, the Court notes that defendant filed a Motion to Disregard Issues Raised for the First Time in EEOC's Reply, or in the Alternative, for Leave to File a Sur-Reply [Doc. 200]. In this motion, defendant asks the Court to disregard portions of the EEOC's reply brief [Doc. 199] filed in support of its Motion for Permanent Injunction [Doc. 161] because the reply raises new issues and arguments that the EEOC did not raise in its opening brief. In the alternative, defendant ask that the Court consider its proposed sur-reply [Doc. 200-1], which addresses the new issues raised in the EEOC's reply. The Court finds that the EEOC's reply brief will aid the Court in its determination on the injunction issue. As such, the Court will

consider the EEOC's reply brief. Furthermore, the Court will also consider defendant's proposed sur-reply. Consequently, the Court finds that, to the extent that the EEOC raised issues for the first time in its reply brief, defendant was not prejudiced because it provided a substantive response to those arguments. As such, the Court will grant defendant's Motion to Disregard Issues Raised for the First Time in EEOC's Reply, or in the Alternative, for Leave to File a Sur-Reply [Doc. 200], to the extent that the Court considers defendant's proposed sur-reply in ruling on the EEOC's motion for injunctive relief.

## VII.    Motion for a Permanent Injunction

The EEOC moves the Court to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) to include injunctive relief. According to the EEOC, it seeks a permanent injunction to alleviate the effects of defendant's past discriminatory practices and to prevent similar violations from occurring in the future. The EEOC submitted a proposed injunctive order to the Court [Doc. 199-4].[4]

The ADA incorporates remedies available under Title VII of the Civil Rights Act of 1964, which include injunctive relief. 42 U.S.C. § 12117(a) (incorporating remedies available under Title VII); *id.* § 2000e-5(g)(1) (remedies available under Title VII). Specifically, the statute provides that upon a finding that a defendant has "intentionally engag[ed] in an unlawful employment practice charged in the complaint, the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order

---

[4] The EEOC initially submitted a different proposed order [Doc. 162-4], but it amended the proposed order when it filed its reply brief.

such affirmative action as may be appropriate, which may include . . . equitable relief as the court deems appropriate." *Id.*

Although injunctive relief is available, courts are "not automatically required to grant injunctive relief" when a jury determines that an employer violated the law. *Prentice v. Am. Standard, Inc.*, Nos. 91-6126, 91-6127, 1992 WL 172662, at *2 (6th Cir. July 23, 1992). Rather, after a plaintiff establishes that the defendant is liable under the ADA, and the plaintiff requests injunctive relief, the defendant has the burden to produce evidence "tending to show that it has taken, and will continue to take, effective measures to prevent a recurrence of the actionable conduct." *Id.* However, the plaintiff bears the "ultimate burden of proving that injunctive relief is necessary," and may satisfy this burden by "persuad[ing] the trial judge that there [is] a cognizable danger that [the] defendant [will] not take effective steps to prevent the conduct from recurring." *Id.*

If the EEOC satisfies this burden, the Court "has not merely the power, but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discriminations in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975). Furthermore, the Court "possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law." *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 468 (6th Cir. 1999).

Defendant objects to any form of injunctive relief as it argues such relief is unnecessary because the facts demonstrate that it is unlikely there will be recurrent ADA violations. In addition, defendant asserts that the specific terms of the EEOC's requested

injunction are overbroad.  The Court will first address whether any form of injunctive relief is necessary.

## A.    Whether the Injunction is Necessary

Defendant asserts that injunctive relief is unnecessary because the facts presented at trial demonstrate it is unlikely defendant will engage in recurrent violations of the ADA. The EEOC argues injunctive relief is necessary because the facts presented at trial show that defendant's employees lack a general understanding of the ADA and, consequently, recurrent violations are likely.

In order for a plaintiff to satisfy its burden of showing that injunctive relief is "necessary," it must show a "cognizable danger that [the] defendant [will] not take effective steps to prevent the conduct from recurring." *Prentice*, 1992 WL 172662, at *2. This burden requires "something more than a mere possibility" of a recurrent violation. *Kulling v. Grinders for Indus., Inc.*, 185 F. Supp. 2d 800, 822 (E.D. Mich. 2002) (citing *EEOC v. Gen. Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989)).

The Court notes that when the EEOC brings an enforcement action, "it sues both for the benefit of specific individuals and the public interest," and it may obtain "general injunctive relief" even where it "does not allege a pattern or policy of discrimination." *Frank's Nursery*, 177 F.3d at 458, 467–68.  Because the Court must make its determination based on the likelihood of an "employer's potential future actions, the EEOC need not prove that the employer previously engaged in widespread discrimination, and 'injunctive relief is appropriate even where the [EEOC] has produced no evidence of discrimination

33

going beyond the particular claimant's case.'" *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 842 (7th Cir. 2013) (alteration in original) (quoting *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir. 1997)). Indeed, the EEOC may seek injunctive relief "upon proof even of just one instance of discrimination." *Frank's Nursery*, 177 F.3d at 468.

Defendant asserts that this case presents an isolated incident where one former store manager, Wanda Shown, mishandled Atkins's request for an accommodation. The EEOC argues, however, that it seeks relief to address the conduct of all the decision makers involved in this case. Specifically, the EEOC contends that it requests injunctive relief due to: (1) the failure of each of defendant's decision makers involved in this case to properly address Atkins's requested accommodation; (2) the decision to terminate Atkins; (3) the decision makers' failures to properly address Atkins's termination; and (4) defendant's failure to adequately inform and train its employees of their rights under the ADA.

While defendant asserts that this case centers on Shown's failure to accommodate Atkins, defendant does not fully acknowledge the evidence that several of defendant's other employees played a role in the events leading to Atkins's termination and the subsequent ratification of that termination. These individuals include Scott Strange, Jeri West, Matthew Irwin, and Heather Robinson.

In particular, the Court notes that Shown did not make the decision to terminate Atkins. Indeed, there is no evidence in the record that Shown recommended Atkins's termination or played any role in the decision to do so. Rather, Scott Strange, a current District Manager for defendant, terminated Atkins [Doc. 154 pp. 158–59]. At the time he

made that decision, Strange was aware that Atkins was diabetic and that she wanted "special permission to have her juice at the register" [*Id.* at 165].

In addition, Jeri West upheld the decision to terminate Atkins. West has worked for defendant for thirteen years and currently works as an Employee Relations Manager [Doc. 155 pp. 117–18]. At the time of Atkins's termination, West worked as defendant's Employment Practices and Dispute Resolution Manager [*Id.* at 118]. Both West's current and former positions require her to make decisions on whether to uphold or overturn terminations [*Id.* at 118, 121]. When Atkins called West regarding her termination, Atkins explained that she drank defendant's juice prior to purchasing it because of her diabetes [*Id.* at 168]. According to Atkins, she informed West that she had asked Wanda Shown if she could keep juice at the register [Doc. 154 pp. 40–41]. Atkins also told West that she believed Shown was unaware that the ADA requires employers to provide reasonable accommodations [Doc. 155 p. 155]. Despite this, West did not speak to anyone else at the company, including Shown, before deciding to uphold Atkins's termination [*Id.* at 174].

Matthew Irwin, who has worked for defendant as a Regional Loss Prevention Manager for six years, recommended Atkins's termination [Doc. 153 pp. 46, 85–86]. When Irwin interviewed Atkins, Atkins stated that she had previously asked her manager for an accommodation [*Id.* at 70–73]. Irwin advised Atkins that she could "request special permission to keep her own orange juice at the register," and despite Atkins's indication that she wanted to request such permission, Irwin recommended that Strange immediately terminate Atkins [*Id.* at 85–86].

35

Heather Robertson worked for defendant for over seven years in various roles in human resources ("HR") and her final position was Regional HR Manager [Doc. 153 p. 9]. Atkins contacted Robertson about her termination [Doc. 154 p. 40]. Atkins testified at trial that Robertson told Atkins that she would contact Atkins after speaking with her boss, but Atkins never received a call back from Robertson [*Id.*]. Robertson thought that Atkins's termination was appropriate [Doc. 153 p. 40]. Additionally, she received an email from Jeri West in which West explained that Atkins was disputing her termination [*Id.* at 41–42]. In the email, West also provided that Wanda Shown did not know the reasonable accommodation requirements and she requested that Shown receive training on the topic [*Id.* at 42]. Robertson does not recall following up on this request with Strange or Shown [*Id.* at 42–43].

The jury determined not only that defendant denied Atkins's right to a reasonable accommodation, but also that her discharge was discriminatory. There is evidence in the record that several of defendant's employees involved in the decision to terminate Atkins knew that she had requested an accommodation from Shown, yet that knowledge did not affect their decisions regarding Atkins's termination.

Defendant argues that this case is similar to *Spencer v. Gen. Elec. Co.*, 894 F.2d 651 (4th Cir. 1990), where the Fourth Circuit upheld a district court's decision not to award injunctive relief because the "case present[ed] an isolated incident of one supervisor run amok" rather than "systematic company-wide discrimination." *Id.* at 660. In *Spencer*, the plaintiff's claims arose from her allegations of sexual harassment by her supervisor. *Id.* at

36

654. The district court found in favor of the plaintiff on her hostile work environment claim under Title VII, and the plaintiff moved for injunctive relief against the employer. *Id.* at 654–55. The district court determined that injunctive relief was not appropriate because there was no evidence "that employees elsewhere in the company were involved." *Spencer v. Gen. Elec. Co.*, 703 F. Supp. 466, 470 (E.D. Va. 1989). The Fourth Circuit upheld this decision in part because, in response to the events giving rise to the lawsuit, the employer had "gotten rid of the offending supervisor, transferred plaintiff to a job of equal grade, and instituted an extensive company-wide anti-sexual harassment policy." *Spencer*, 894 F.2d at 660.

In contrast, here, several individuals were involved in the decision to terminate Atkins. Furthermore, unlike in *Spencer*, defendant has not presented any evidence that it has taken any additional steps to prevent future ADA violations. In fact, West, who defendant still employs, does not know if defendant has reviewed its policies and training regarding the ADA and reasonable accommodations [Doc. 155 pp. 195–96]. Although Shown no longer works for defendant, the Court notes her cessation of employment was unrelated to her failure to reasonably accommodate Atkins's disability [Doc. 154 pp. 237–38]. Indeed, there is no evidence in the record that any manager discussed Atkins's circumstances with Shown, that Shown was reprimanded in any way for her actions, or that she received any training on the ADA after Atkins's termination.

While defendant asserts that "there is no evidence that [its] nondiscrimination policy, its ADA accommodation policy, its processes for requiring employees to review

and sign off on each policy, or its training programs are insufficient to maintain compliance with the ADA," the Court finds that there is significant evidence to the contrary [Doc. 194 p. 2]. Despite defendant's policies and procedures, four management-level individuals—Strange, West, Irwin, and Robertson—all agreed that Atkins's termination was justified. The jury, however, determined that Atkins's termination was unlawful under the ADA. In addition, while defendant requires employees to review and sign off on its ADA policies, several employees testified that they had no knowledge of such policies [Doc. 151 pp. 73–74; Doc. 155 pp. 214, 217].

The Court also notes that Strange, West, and Irwin still work for defendant, and this fact increases the likelihood that ADA violations could recur. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (finding that the employer's current procedures are not necessarily effective when management "felt free to ignore [the] policies in the past" and "there is no reason to believe that those same members of management will abide by them in the future"); *Ilona of Hungary*, 108 F.3d at 1579 ("[I]njunctive relief is justified . . . where the individuals who were found to have discriminated remain the defendant's primary decision-makers."). Furthermore, it is also telling that defendant has not admitted any wrongdoing in this case. *See EEOC v. Exel, Inc.*, No. 1:10-CV-3132, 2017 WL 12538889, at *2 (N.D. Ga. Mar. 13, 2014) (ordering injunctive relief in part because the employer had not admitted to any wrongdoing, which contributed to the likelihood that Title VII violations would recur).

In determining whether injunctive relief is necessary, the Court also considers the testimony of Donna Kestler, who worked for defendant as a stocker and later as an assistant manager [Doc. 155 pp. 214, 217]. Kestler testified that due to a health condition, she asked Scott Strange if she could use a buggy to move boxes [*Id.* at 219]. Strange denied this request and, as a result of this denial, Kestler quit her job [*Id.* at 220]. Strange did not tell Kestler to contact HR or any other personnel [*Id.* at 221].

Defendant argues that Kestler's testimony is insufficient to establish an ADA violation and, therefore, it does not show that defendant has repeatedly violated the ADA. While the Court agrees that Kestler's testimony is not conclusive evidence that defendant has engaged in multiple ADA violations, her statements provide some evidence as to the likelihood of ADA violations. Furthermore, the Court notes that the EEOC may seek injunctive relief "upon proof even of just one instance of discrimination," and thus multiple ADA violations are not a prerequisite to injunctive relief. *Frank's Nursery*, 177 F.3d at 468.

Accordingly, the Court finds that the following factors weigh in favor of ordering injunctive relief in this matter: (1) the number of defendant's personnel involved in this case; (2) the evidence that defendant's employees do not know defendant's ADA policies; (3) defendant's refusal to admit wrongdoing; (4) the lack of evidence of any action taken against Shown, such as through training or reprimanding; (5) the lack of evidence that defendant has implemented any additional policies or procedures to prevent future ADA violations; (6) the evidence that Kestler's circumstances may have constituted an ADA

violation; and (7) the fact that Strange and West still work for defendant. As such, the Court finds that the EEOC has met its burden of showing that injunctive relief is necessary in this case by showing "a cognizable danger that [the] defendant [will] not take effective steps to prevent the conduct from recurring." *See Prentice*, 1992 WL 172662, at *2. In doing so, the Court notes that defendant has not presented any evidence that it has taken steps to prevent future ADA violations. Rather, defendant points to its current procedures and insists they are sufficient, despite the failure of such procedures to prevent the circumstances giving rise to this action. For these reasons, the Court finds that the EEOC is entitled to injunctive relief.[5]

---

[5] In arguing that injunctive relief is not appropriate, defendant asserts that this case is similar to *EEOC v. New Breed Logistics, Inc.*, No. 10-2696, 2013 WL 12043550 (W.D. Tenn. Dec. 20, 2013), in which the court determined that a similar request for injunctive relief by the EEOC was "overbroad and generally unnecessary." *Id.* at *1. In *New Breed*, the court found that the EEOC had not met its burden of showing a "cognizable danger that New Breed will not take steps to prevent the unlawful conduct." *Id.* Defendant contends that the instant case is similar to *New Breed* because, like *New Breed*, this case "involv[es] a single punitive 'bad actor' and no evidence of other incidents of discrimination" [Doc. 194 p. 10]. The Court notes, however, that *New Breed* involved a "sole employee charged with sexual harassment" who "was terminated almost immediately." *Id.* While other New Breed employees were involved in the decision to terminate the plaintiffs, the court noted that the employee who engaged in sexual harassment was "at the heart of the retaliation claims." *Id.* The court also noted that the defendant "ha[d] demonstrated that it has a sexual harassment policy in place. Employees are required to attend an orientation, which includes an overview of New Breed's anti-harassment and anti-retaliation policy." *Id.* at *2. In contrast, here, there is no evidence that defendant terminated or even reprimanded Shown, or that defendant's employees who made the determination to terminate Atkins and to ratify that termination did so without Shown's input or direction, and defendant has not provided evidence that it requires its employees to attend an orientation providing an overview of its discrimination policies. As such, the Court finds that this case is distinguishable from *New Breed*.

40

## B. Specific Terms of the Requested Injunction

Having found that the EEOC is generally entitled to injunctive relief, the Court will now consider whether the specific terms of the EEOC's requested injunction are justified. "The proper scope of an injunction is to enjoin conduct which has been found to have been pursued or is related to the proven unlawful conduct." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994). The Court "possesses broad discretion to craft an injunction that will ensure the employer's compliance with the law." *Frank's Nursery*, 177 F.3d at 468. However, "this discretion is not unlimited," and "[p]rovisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong." *EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998).

The Court notes, however, that when the EEOC files suit, it "pursues an interest broader than the one private [discrimination] litigant pursues." *Frank's Nursery*, 177 F.3d at 462. "[T]he EEOC possess[es] an independent authority to vindicate the public interest by suing in its own name." *Id.* at 467.

Defendant asserts that the injunctive relief the EEOC seeks is overbroad and untethered to the jury's determinations of liability at trial. The Court will first address the EEOC's proposed geographic scope of the injunction, and will then address the other proposed provisions as laid out in the EEOC's proposed injunction order.

### 1. Geographic Scope

Several paragraphs of the EEOC's proposed injunction reference Region 82 and the Goodlettsville, Tennessee corporate office. Defendant submits that Region 82 contains

195 stores with 1,547 employees and the corporate office has another 1,018 employees. Defendant asserts that this proposed geographic scope is overbroad and that the Court should limit the scope of any injunctive relief to the store where Atkins worked—Store #3988 in Maryville, Tennessee.

The EEOC argues that its proposed geographic scope "is appropriate and tailored to the scope of authority and influence of each [defendant] official involved in the decision to deny" Atkins her rights under the ADA [Doc. 199 p. 5]. The EEOC notes that Scott Strange, defendant's District Manager who terminated Atkins, is responsible for seventeen or eighteen stores in East Tennessee and at least 120 employees [Doc. 154 pp. 158–89]. Heather Robertson, defendant's former Regional HR Manager who did not address Atkins's concerns about her termination or Shown's lack of knowledge of ADA requirements, supported three regions, which included 600 stores and thousands of employees [Doc. 155 pp. 10, 37]. Matthew Irwin, defendant's Regional Loss Prevention Manager who recommended Atkins's termination, has oversight over Region 82, which includes over 200 stores [Doc. 155 pp. 46, 80]. Lastly, Jeri West, defendant's Employee Relations Manager who did not overturn Atkins's termination, shared responsibility with another employee for handling employment-related disputes for the entire corporation [Doc. 155 pp. 181–82]. West currently works in defendant's corporate office [Doc. 153 p. 117]. Based on this evidence, the EEOC contends that it has presented evidence demonstrating that this case reaches beyond Maryville, Tennessee. The EEOC also notes

that its proposed geographic scope is narrower than defendant's nationwide operation, which consists of over 13,000 stores and 100,000 employees.

Defendant argues that the EEOC's proposed geographic scope is overbroad because there was no proof at trial of any other acts of disability discrimination at stores other the Maryville store or at the corporate headquarters. Furthermore, defendant asserts that the geographic scope is untethered to the harm plaintiffs' asserted at trial. According to defendant, "[t]he record shows that this was a single incident of a single Store Manager at a single store in Maryville, Tennessee allegedly 'dropping the ball' on a single accommodation request" [Doc. 194 p. 15]. Accordingly, defendant asserts that the injunction should not apply beyond the store in Maryville.

The Court has already determined that plaintiffs presented proof that West, Irwin, Strange, and Robertson, in addition to Shown, each played a part in defendant's discriminatory conduct. While defendant contends that there is no evidence that ADA violations will recur beyond the Maryville store, West, Irwin, Strange, and Robertson's duties were not confined to the Maryville store. Furthermore, defendant still employs West, whose duties extend across defendant's nationwide operation, as well as Strange and Irwin. Rather than requesting that the injunction encompass the entire company, the EEOC proposed that the geographic scope should include Region 82, over which Irwin has oversight as a Regional Loss Manager, and defendant's corporate office, where West works.

The Court finds, therefore, that there is evidence to support implementing a geographic scope for the injunction that goes beyond the Maryville store. The evidence presented at trial indicates that several of defendant's employees outside the Maryville store either engaged in or ratified discriminatory conduct or otherwise was not knowledgeable of the discriminatory nature of such conduct. Furthermore, West, Irwin, Strange, and Robertson held or hold positions in which their actions affect defendant's employees across a large region.

The EEOC has the right to "seek[] injunctive relief to protect employees as a class and to deter the employer from discrimination." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1543 (9th Cir. 1987). Here, the EEOC seeks to protect defendant's employees from recurrent ADA violations through an injunction with a geographic scope that is tethered to the authority of the decision makers involved in this case. As the decision makers' actions affect employees far beyond the Maryville store, the Court finds that a broader geographic scope is warranted. The Court further notes that the evidence at trial indicated that defendant's employees have a general lack of understanding as to the ADA's requirements. The decision makers, who have not admitted any wrongdoing in connection with their actions against Atkins, should be further trained on the ADA in order to prevent recurrent violations. As the EEOC has the right to seek an injunction in order to deter defendant from engaging in further ADA violations, the Court finds that enjoining one store, with less than twenty employees, would not serve to deter defendant from engaging in disability discrimination.

In sum, the Court finds that a geographic scope which includes Region 82 and defendant's corporate office is tethered to the harm plaintiffs asserted at trial. Consequently, the Court finds that the scope is necessary and is not overbroad. The Court will, therefore, include the EEOC's proposed geographic scope in the injunction order.

## 2. Paragraph 1: Request Regarding Anti-Grazing Policy

Paragraph 1 of the EEOC's proposed injunction provides:

> Dolgencorp is enjoined from disciplining and/or discharging any employee for violation of its anti-grazing policy without first assessing whether the violation was due to the employee's disability. If the anti-grazing policy violation occurred because of an employee's disability, Dolgencorp will not discipline or discharge the employee. Instead, Dolgencorp will engage in the interactive process with that employee and determine whether it can reasonably accommodate the employee's disability without undue hardship to avoid any future violations of the anti-grazing policy [Doc. 199-4 p. 2].

The EEOC contends that this relief is necessary to ensure that defendant does not unlawfully discharge or refuse to reasonably accommodate disabled employees in the future.

Defendant asserts that the Court should not include this provision in the injunction because it is contrary to law. It contends that this provision would "grant[] blanket, prospective absolution to employees who violate [defendant's] employee purchase policy by grazing, irrespective of whether they requested an accommodation for an alleged disability" [Doc. 200-1 p. 6]. Defendant submits that the ADA does not require employers to excuse misconduct as an accommodation and employees are not entitled to "retroactive leniency" for prior misconduct as a reasonable accommodation [*Id.* (citing *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299 (10th Cir. 2017); *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484

45

F.3d 357 (6th Cir. 2007))].  Consequently, defendant asserts that the EEOC's proposal in paragraph 1 is "contrary to controlling law, and were it adopted, the Court would be *prohibiting* employment actions expressly *permitted* under federal law" [*Id.*].

The Court notes that "[i]n fashioning relief against a party who has transgressed the governing legal standard, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994).  Accordingly, courts may enjoin lawful conduct which previously allowed discrimination to occur.  *See id.* (providing that courts may enjoin activities "related to the proven unlawful conduct").

Although the Court finds that it may enjoin lawful activity in fashioning an appropriate injunction, the Court does not find that this particular injunctive relief is necessary to prevent discrimination.  While the EEOC has met its burden in showing a "cognizable danger that [the] defendant [will] not take effective steps to prevent" recurring disability discrimination, the EEOC has not shown a "cognizable danger" that such discrimination would again arise in the context of the anti-grazing policy.  *See Prentice*, 1992 WL 172662, at *2; *see also EEOC v. DCP Midstream, L.P.*, 608 F. Supp. 2d 107, 111 (D. Maine 2009) (finding that the discrimination "arose in a constellation of circumstances that may not recur" which justified "limit[ing] the relief, but not deny[ing] an injunction altogether").

While the EEOC contends that this provision is necessary to prevent defendant from unlawfully discharging or refusing to reasonably accommodate disabled employees, the

Court finds that the provision in paragraph 1 is too specific to be necessary to prevent defendant from, more broadly, engaging in ADA violations. Rather, the Court finds that including several of the EEOC's other proposed injunction provisions will be sufficient to achieve the EEOC's goal of deterring defendant from engaging in further violations.

### 3. Paragraph 2: Letter to Employees From Defendant's CEO

Paragraph 2 of the EEOC's proposed injunction provides the following:

> Dolgencorp must deliver a letter to all of its employees who work within Region 82 and its Goodlettsville, Tennessee corporate office, advising them of the verdict against Dolgencorp in this case on the claim of disability discrimination, stating that Dolgencorp will not tolerate disability discrimination and that Dolgencorp will take appropriate disciplinary action against any manager, supervisor or employee who engages in disability discrimination. The letter shall be printed on Dolgencorp's letterhead and shall be signed by Dolgencorp's Chief Executive Officer [Doc. 199-4 pp. 2–3].

The EEOC argues that this proposed relief is necessary because defendant's employees in Region 82 and defendant's corporate office "are either unaware of their rights under the ADA, denied their rights under the ADA, lack knowledge of how to apply the ADA, or selectively chose when to apply the ADA" [Doc. 199 p. 7].

Defendant asserts that this this request is overbroad and unnecessary because the EEOC has not produced evidence of disability discrimination prior to or since the incident at issue. The Court notes, however, that the EEOC has produced evidence that several of defendant's employees, including management, non-management, store-level, field, and corporate employees, within the geographic area, do not have a sufficient understanding of the ADA. In addition, although the EEOC has not necessarily established that defendant

has engaged in other discriminatory acts, the EEOC has provided evidence of such acts through the testimony of Donna Kestler.

Furthermore, while defendant contends that there has been extensive evidence of defendant's use and application of a lawful disability accommodation policy, the jury determined that defendant's employees acted in violation of the ADA by failing to provide Atkins with a reasonable accommodation and subsequently discharging her. As such, defendant's current policy proved inadequate in that several of defendant's employees were either involved in the discriminatory conduct, ratified such conduct, or chose to ignore it. Furthermore, several employees testified as to their general lack of knowledge regarding the ADA and its requirements.

Overall, the evidence presented at trial revealed that defendant's current policies designed to prevent disability discrimination are inadequate in that defendant's employees either do not understand the policies or they are not aware of them. Consequently, the Court finds that including a provision in the injunction that will ensure defendant's employees are notified of their rights under the ADA, and of defendant's policies in place to protect such rights, is necessary to prevent recurrent violations. However, rather than mailing a letter with defendant's CEO's signature, the Court finds that training, as suggested in paragraphs 5 and 6 of the EEOC's proposed order, is an appropriate and sufficient measure to ensure awareness of the ADA and defendant's anti-discrimination policies. *See EEOC v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) (cautioning against

imposing conditions of an injunction which are broader than necessary to remedy the underlying wrong).

### 4. Paragraph 3: Posting of Defendant's Notice of Non-Discrimination Policy

Paragraph 3 of the EEOC's proposed injunction order provides:

> Dolgencorp must post a copy of the remedial Notice of Non-Discrimination Policy, hereto attached, in a conspicuous place on the premises of each store within Region 82 and its Goodlettsville, Tennessee corporate office. The notice must remain posted for the duration of the compliance period of this Judgment of Injunctive Relief. Defendant shall also continue to conspicuously post the Notice (poster) required by Title VII, throughout the compliance period of this Judgment of Injunctive Relief. Dolgencorp shall ensure that the posting is placed in a location that supports unobstructed viewing [Doc. 199-4 p. 3].

The EEOC asserts that posting its proposed Notice of Non-Discrimination Policy [Doc. 199-4 p. 8] is necessary in this case in order to raise employees' awareness of their rights under the ADA. As was the case with the EEOC's request for the CEO letter, the Court finds that this condition is unnecessary in light of the training requirement the Court will include in the injunction.

In paragraph 3, the EEOC also includes a provision requiring defendant to "conspicuously post" the Equal Employment Opportunity ("EEO") poster, as Title VII requires [*Id.*]. Defendant contends that this provision is unnecessary because it already posts an EEO poster in all of its stores. While this may be true, defendant's Assistant Manager, Mary Jane Ray, testified at trial that the employee-rights posters located in the break room at the Maryville store are mostly blocked from view [Doc. 151 p. 74–75]. She

stated that such posters have been blocked for as long as she has worked at the Maryville store, even up until September 12, 2016, the date she testified at trial [*Id.*].

Despite this evidence, the Court assumes this memorandum and order, which draws attention to Title VII's requirements regarding the EEO poster, in combination with the training requirement the Court will impose, will be sufficient to ensure defendant's compliance with the EEO poster requirements in the future. The Court therefore finds it unnecessary to include any poster or notice related conditions in the injunction order.

**5.      Paragraph 4: Neutral Job Reference**

Paragraph 4 of the EEOC's proposed injunction order provides the following:

> If contacted for references by another potential employer, Dolgencorp shall provide Linda K. Atkins a neutral job reference, stating only her dates of employment and positions held [Doc. 199-4 p. 3].

The EEOC contends that this provision is necessary because Atkins intends to reenter the workforce and will need a reference from defendant that does not mention her disability, termination, charge of discrimination, or this lawsuit. In response, defendant asserts that providing such references is its regular practice. The EEOC provides, however, that even if defendant has that regular practice, "in a case such as this, where an employee has gone as far to file a lawsuit against [defendant], one can never be too cautious" [Doc. 199 p. 8].

Here, unlike the obstructed posters, the EEOC has not provided any evidence that defendant would not abide by its policy of responding to reference requests only with dates of employment and positions held. Accordingly, the Court finds that requiring a neutral job reference "is unnecessary and generally duplicative of procedures already in place."

50

*See EEOC v. New Prime, Inc.*, No. 6:11-CV-3367, 2016 WL 3033773, at *2 (W.D. Mo. May 26, 2016) (declining to provide injunctive relief ordering the defendant to engage in procedures similar to those it already had in place). As such, the Court will not include this provision in the injunction order.

### 6.    Paragraphs 5 and 6: Training

Paragraphs 5 and 6 of the EEOC's proposed injunction order require that: (1) defendant provide training to all of its employees in Region 82 and its corporate office and that the training  "include an explanation of the requirements of the ADA, including the interactive process, reasonable accommodations, and Dolgencorp's anti-discrimination policy"; and (2) that defendant "provide the EEOC with a copy of the training materials and related documentation that it intends to use for the training" [Doc. 199-4 pp. 3–4]. The EEOC asserts that this relief is necessary because the trial testimony suggests that defendant is not adequately informing its employees on the ADA and defendant's ADA-related policies and procedures. It argues that the lack of effective training is also highlighted after considering the actions of Shown, Strange, Robertson, Irwin, and West, which resulted in defendant's failure to provide Atkins with a reasonable accommodation and its discriminatory termination of her.

Defendant asserts that additional training is unnecessary because it already notifies employees of its policies and its managers receive training on anti-discrimination and accommodation. It further argues that there is no evidence that any additional training would be more effective in preventing disability discrimination.

While defendant provided evidence that it notifies all employees of its EEO policies as part of its onboarding program, it appears this notification is insufficient. As discussed previously, the evidence at trial showed that several of defendant's employees at various levels of the corporate structure, including Shown, Strange, Robertson, Irwin, and West, had either little understanding of the ADA itself or of their obligation to fulfill the ADA's requirements in their interactions with employees. Because of this, the EEOC's proposed training conditions will be included in the injunction order.

### 7. Paragraph 7: Notice Regarding Paragraphs 1 and 2

Paragraph 7 of the EEOC's proposed injunction requires that defendant certify with the Court that it has sent the letters as provided in paragraph 2 and posted the Notice as mentioned in paragraph 3 [Doc. 199-4 p. 7]. As the Court has declined to impose these conditions, any such certification requirements are unnecessary.

### 8. Paragraph 8: Monitoring

Paragraph 8 of the EEOC's proposed injunction order requires that defendant report to the EEOC once a year for the duration of the injunction certain details regarding: (1) all requests for accommodation made by employees or applicants in Region 82 or corporate headquarters; and (2) all employees discharged "for disability-related reasons" [Doc. 199-4 pp. 4–5]. The EEOC contends that this monitoring provision is appropriate "because of the complete failure of multiple managers at every level to adequately address Ms. Atkins' simple request to keep orange juice at the register and her resulting termination" [Doc. 199

p. 9]. Defendant objects to the monitoring provision asserting, among other arguments, that the request is speculative and unduly burdensome.

Although the jury determined that defendant engaged in unlawful discrimination, the Court does not find that defendant's conduct warrants imposing such monitoring requirements. The Court finds that requiring defendant to provide additional training is sufficient in light of the evidence presented at trial. *See EEOC v. Autozone, Inc.*, No. CV 06-926, 2009 WL 3763682, at *4 (D. Ariz. Nov. 9, 2009) (finding monitoring and reporting requirements unwarranted where there was "one instance of [unlawful discrimination] in a company with 2,500 employees" and the court ordered the employer to conduct training and to post notices). Accordingly, the Court will not include this monitoring provision in the injunction order.

### 9.     Paragraph 9: Compliance

Paragraph 9 of the EEOC's proposed injunctive order provides that "[t]he EEOC may review compliance with this Permanent Injunction" by: (1) inspecting, without notice, any of defendant's stores within Region 82 for compliance with the posting provisions; and (2) interviewing employees and examining documents related to the enforcement of the injunction [Doc. 199-4 pp. 5–6]. The EEOC contends that this provision is necessary in light of the testimony that defendant's store-level employees were unaware of their rights under the ADA and that the EEO posters were inaccessible. Defendant objects to this request, arguing that it is overbroad and unnecessary in light of the evidence at trial.

In light of its decision to deny certain aspects of the EEOC's requested injunction, the Court finds that the EEOC's request to inspect stores or interview employees to ensure compliance is unnecessary. Rather, to ensure compliance with the training requirement, the Court will order that defendant: (1) maintain attendance sheets for each training session and forward a copy of the attendance sheets to the EEOC; and (2) submit proof to the EEOC, via an affidavit by a person of knowledge, establishing the completion of training. *See DCP Midstream, L.P.*, 608 F. Supp. 2d at 113–14 (including such provisions in an injunction against an employer as a remedy for discriminatory conduct).

### 10. Paragraphs 10 and 12: Notice of Violation and the Court's Jurisdiction

In paragraph 10 of the EEOC's proposed injunction order, it proposes that the EEOC should notify defendant of any alleged violations of the injunction before exercising legal remedies and that defendant shall have sixty days to investigate and respond to the allegation [Doc. 199-4 p. 6; *see* Doc. 199 p. 11 (noting that the EEOC believes thirty days is ample time to respond, but it will agree to sixty days)]. Paragraph 12 provides that the Court should retain jurisdiction to monitor compliance with the injunction [Doc. 199-4 p. 7]. Defendant appears to have no objection to these provisions other than its general argument that there is no basis for injunctive relief. As such, the Court will include these provisions.

### 11. Paragraph 11: Term of the Injunction

In paragraph 11 of the EEOC's proposed injunction order provides that the duration of the injunction should be three years [Doc. 199-4 p. 6; *see* Doc. 199 p. 12 (noting that

while a four-year term is justified, the EEOC is willing to reduce its request to three years). The Court finds that a three-year term for the injunction is justified in this case.

## VIII.          Motion for Attorney Fees and Costs

The Court referred Atkins's Motion for Award of Attorneys' Fees and Costs [Doc. 163], as well as her supplemental motions [Docs. 202, 211], to Magistrate Judge Guyton. Judge Guyton filed an R&R [Doc. 214] in which he recommends that Atkins's motions [Docs. 163, 202, 211] be granted in part and denied in part and that the Court award Atkins $445,322.25 in attorney's fees and $1,676.95 in litigation expenses.

Defendant timely filed eight objections to the R&R [Doc. 217]. Plaintiff responded in opposition to defendant's objections [Doc. 218]. When ruling on objections to a magistrate judge's R&R, "the court must conduct a de novo review of portions of the R&R to which a party objects unless the objections are frivolous, conclusive, or general. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are entitled to de novo review. *Mira*, 806 F.2d at 637 ("The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider."). A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). An objection that does nothing more than disagree with a magistrate judge's findings, "without explaining the source of the error," is not considered a valid objection.

*Id.* In fact, "[a] district court should only review for clear error where a party makes perfunctory arguments to engage the district court in rehashing the same arguments set forth in the original petition." *Brooks v. Invista (Koch Indus.)*, 528 F.Supp.2d 785, 788 (E.D. Tenn. 2007). Without specific objections, "[t]he functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrate's Act." *Id.*

The Court finds several of defendant's objections to be closely related. The Court will thus forego addressing each of the eight objections under individual headings, and will instead organize its analysis based on the substance of the objections. For the reasons explained below, the Court will overrule each of defendant's objections to the R&R and accept the R&R in whole.

> **A.** **Consideration of "degree of success" and "complexity of the case" in determining whether the amount of attorneys' fees requested is reasonable (objections one and two)**

Defendant objects to Judge Guyton's consideration of plaintiff's attorneys' degree of success and the complexity of the case in determining a reasonable hourly rate to use in calculating the recommended total fee award. Defendant argues it is error to adjust the hourly rate for the relevant market based on an attorney's degree of success or the complexity of the case. Specifically, Defendant argues degree of success should not be considered when determining if enhancement of an hourly rate is appropriate, but instead should be considered in determining the initial hourly rate that should apply in a given case,

and that the complexity of a given case should be reflected in the number of hours billed for a case, not in the applicable hourly rate.

Relying on *Isabel v. City of Memphis*, Judge Guyton considered both the degree of success and the complexity of the case in determining the reasonable hourly rates for plaintiff's attorneys. 404 F.3d 404, 415–16 (6th Cir. 2005) (identifying "time and labor required," "the novelty and difficulty of the questions presented," "the skill needed to perform the legal service properly," and "the amount involved and the results obtained" as factors courts should consider in determining the reasonableness of an hourly rate). After considering the relevant factors outlined in *Isabel*, as well as the prevailing market rate in the Knoxville area, fee awards in similar cases, and the rate necessary to entice competent legal counsel to perform the work required, Judge Guyton decided to recommend reducing the hourly rates requested by plaintiff's attorneys from $400 to $350 for Attorney Morton and from $300 to $250 for Attorney Ayesh [Doc. 214 pp. 9–13].

Defendant seems to assume that the appropriate hourly rates in this case are $250 for Attorney Morton and $175 for Attorney Ayesh, and thus argues Judge Guyton's decision to determine a fee award based on hourly rates of $350 and $250, respectively, represent enhancements above the appropriate hourly rate based on factors that were already considered in determining the baseline hourly rate, such as degree of success. *See Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010) (noting that enhancements to lodestar rates may not be based on a factor that is subsumed in the lodestar calculation). This is an incorrect interpretation of the R&R. Judge Guyton, considering the appropriate factors,

determined the appropriate hourly rates for each attorney, and did not enhance those rates on any basis, let alone on an impermissible basis. This result is consistent with *Perdue*, as *Perdue* cautioned against adjusting or enhancing an hourly rate based on an attorney's performance except in rare or exceptional situations. *Id.* ("We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate.").

With regard to the complexity of the case, Defendant is correct that complexity is normally accounted for in the number of billable hours applied to determine the fee award, as opposed to the hourly rate used in calculating the fee award. *See id.* ("We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors presumably are fully reflected in the number of billable hours recorded by counsel."). The Court notes, again, that Judge Guyton does not recommend an enhancement in this case, but does implicitly recognize the complexity of this case in his hourly rate analysis [Doc. 214 p. 10 ("Moreover, while the Defendant refers to this case a 'routine' ADA case, such allegation is contradicted by the procedural arguments raised in the Defendant's dispositive motions in this case.")]. The Court finds, however, that this single sentence does not undermine Judge Guyton's hourly rate recommendations, as the recommendations are supported by substantial evidence and discussion beyond the implicit reference to the complexity of the case. For example, Judge Guyton considered, among other factors, a number of fee awards in similar cases, including

one in which the attorneys were awarded a $345 hourly rate, and the declarations of experienced lawyers in the Knoxville area identifying $350–$400 as a reasonable rate. Furthermore, the Court finds that the complexity of a given case or type of case is inherently related to the hourly rate "which lawyers of comparable skill and experience can reasonably expect to command within the relevant community" and the hourly rate "necessary to cause competent legal counsel to perform the work required." *See Brooks v. Invista (Koch Industries)*, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008). Thus, some discussion of the nature of the case and its complexity in the hourly rate analysis is to be expected, and such discussion does not justify rejection of a magistrate judge's recommended hourly rate where the recommended hourly rate is supported by other factors in addition to the complexity of the case.

**B.      Conflating the reasonable market rate to attract competent legal counsel with a rate rewarding Morton and Ayesh for their contributions and results obtained in this case (objection three)**

The Court finds the substance of this objection to be the same as defendant's "degree of success" objection discussed above. The Court thus relies on its analysis in the previous section in overruling this objection, and specifically notes its finding that Judge Guyton's recommendation was based on fee awards in similar cases and the declarations of experienced Knoxville lawyers identifying a reasonable hourly rate in this type of case.

**C.** **Failure to specify whether a $350 per hour partner rate and a $250 per hour associate rate are intended to be the new presumptive rates in Knoxville or are the result of extraordinary circumstances limited to this case (objection four)**

Defendant argues $250 per hour has recently been held to be a reasonable rate for experienced attorneys in Knoxville, and objects to the fact that the R&R fails to explain whether it recommends a new presumptive partner rate of $350 for Knoxville, or whether the recommended hourly rate is based on extraordinary circumstances present in this case. The Court notes that the R&R does not state that the recommended hourly rates are based on extraordinary circumstances present in this case, so the Court infers that the recommended hourly rates are not based on extraordinary circumstances. With regard to the establishment of a new presumptive hourly rate for the Knoxville area, Defendant identifies no authority requiring the R&R to make a finding that the recommended hourly rate in this case will presumptively be the recommended hourly rate in similar cases going forward. In light of this, the absence of such a finding in the R&R is not grounds to sustain defendant's objection.

In adopting Judge Guyton's hourly rate recommendations in this case, the Court does not purport to establish a presumptive rate that will apply to all employment cases or even to all ADA cases in the future. In each case it is called upon to do so, the Court will determine a reasonable and appropriate fee award based on the factors and principles identified in controlling case law.

**D.** **The R&R fails to explain why the recommended hourly rates are different than those applied in recent, similar cases (objections five and six)**

Defendant again objects to the hourly rate calculation for both Attorney Morton and Attorney Ayesh, this time arguing the R&R does not sufficiently explain why the recommended hourly rates differ from those applied in recent, similar cases. The Court finds these objections to be substantively similar to defendant's first, second, and third objections, and thus incorporates its analysis of those objections here.

Judge Guyton considered other, similar cases and did, in fact, distinguish recent Knoxville employment cases identified by defendant, finding this case to be distinguishable from a case in which an hourly rate of $250 was applied and identifying a similar case in which an hourly rate of $345 was applied [Doc. 214 pp. 10–11]. To the extent defendant disagrees with Judge Guyton's analysis, or argues it is insufficient to support a finding that lower hourly rates would not be "sufficient to encourage competent lawyers in the relevant community to undertake legal representation," the Court notes Judge Guyton's recommendation is also based on the declarations of several experienced Knoxville lawyers who state plaintiff's attorneys original, higher requested hourly rates of $400 and $300 are reasonable. Judge Guyton did not recommend applying the requested hourly rates because he determined other attorneys comparable to plaintiff's attorneys charge lower hourly rates than $400 and $300, and in some cases where attorneys received hourly rates of $400 the rate was agreed to as part of a settlement. Judge Guyton also

considered Attorney Morton's 2014 retainer agreement, which specifies a rate of $350 per hour.

Put simply, Judge Guyton adequately justified the recommended hourly rates, and in doing so analyzed their relation to other, recent Knoxville employment cases. The analysis underlying the recommendations was both sufficient and appropriate. *See Van Horn v. Nationwide Pro. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011) (noting that a district court may look to "a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests" when determining an appropriate hourly rate).

### E. Failure to analyze the reasonableness and propriety of plaintiff's "fees for fees' request

Defendant objects to Judge Guyton's finding that the 90.4 hours plaintiff's attorneys billed for preparation of their motion for fees was reasonable. Judge Guyton considered the time billed by plaintiff's attorneys for their initial motion for fees and for each of plaintiff's two supplemental motions for fees. Judge Guyton found that the time billed in relation to the second supplemental motion for fees should be reduced by 50%, and implicitly found that the hours billed in relation to plaintiff's other motions for fees were reasonable [Doc. 214 p. 27 ("The Court has reviewed the billing entries and recommends that the time submitted in the Second Supplemental Motion [Doc. 213] be reduced by 50% . . . The Court agrees with the Defendant that [these] billing entries are duplicative and excessive")]. Defendant argues the R&R lacks substantive analysis as to why the hours billed in relation to the first two motions for fees were reasonable.

By singling out the hours billed in the second supplemental motion for fees as unreasonable, duplicative, and excessive, and recommending that the requested hours be reduced by 50%, Judge Guyton distinguishes those hours from the other time plaintiff's attorneys billed in relation to litigating attorney's fees. It is true that Judge Guyton does not explicitly find that the hours billed in the initial motion for fees or the first supplemental motion for fees are reasonable, but it is clear from the context of the R&R that Judge Guyton considered the time billed in those requests to be reasonable, as he contrasted them with the other, unreasonable hours he identified. Inherent in this comparison is Judge Guyton's finding that plaintiff's first two motions for fees did not include time that was unreasonable, duplicative, or excessive.

**F.      Improperly declining to reduce the number of hours billed to account for the EEOC's role in litigating plaintiff's claims**

Defendant argues the R&R improperly declines to reduce the hours billed by plaintiff's attorneys to account for the EEOC's role in litigating plaintiff's claims, as the EEOC likely contributed significantly to the overall workload involved in this litigation. Judge Guyton specifically addressed this line of argument, and determined that no reduction of hours was necessary in this case as Attorneys Morton and Ayesh worked closely with the EEOC to avoid duplicative work to the maximum extent possible.

While Defendant is correct that other courts have reduced fee awards to account for the contribution of government agencies in litigating cases, there is no evidence of redundant or overlapping work in the present case that would support such a reduction. Instead, there is ample evidence in the form of submissions from plaintiff's attorneys and

from EEOC counsel that the two groups worked efficiently and made a significant effort to avoid duplicative work by dividing tasks such as handling depositions and responding to motions. Having considered this evidence, Judge Guyton reasonably and appropriately determined there was no need to reduce the hours plaintiff's attorneys billed in this case due to assistance from the EEOC [Doc. 214 pp. 23–26].

## IX. Conclusion

For the reasons discussed herein, the Court hereby:

A.  **DENIES** defendant's Motion to Amend Judgment and Motion for Judgment as a Matter of Law or, Alternatively, for New Trial [Doc. 159];

B.  **GRANTS in part and DENIES in part** the EEOC's Motion for Permanent Injunction [Doc. 161], to the extent discussed herein;

C.  **GRANTS** defendant's Motion to Disregard Issues Raised for the First Time in EEOC's Reply, or in the Alternative, for Leave to File a Sur-Reply [Doc. 200], to the extent that the Court considered defendant's sur-reply [Doc. 200-1];

D.  **OVERRULES** defendant's objections to the R&R [Doc. 217];

E.  **ACCEPTS IN WHOLE** the R&R [Doc. 214]; and

F.  **GRANTS in part and DENIES in part** Atkins's Motions for Award of Attorneys' Fees and Costs [Docs. 163, 202, 211], in that the Court **AWARDS** Atkins $445,322.25 in attorneys' fees and $1,676.95 in litigation expenses.

The Court will enter a separate Injunction Order including the terms discussed herein.

ENTER:

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE